**CITY–WIDE ASPHALT CO., INC., Appellant,**

v.

**CITY OF INDEPENDENCE, Missouri, et al., Respondents.**

**No. KCD 27604.**

Missouri Court of Appeals, Kansas City District.

Dec. 27, 1976.

Motion for Rehearing and/or Transfer Denied Jan. 31, 1977.

Application to Transfer Denied March 14, 1977.

John S. Newhouse, J. Samuel Newhouse, Independence, for appellant.

James S. Cottingham, John M. Gibson, James L. Gillham, Independence, for respondents.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

TURNAGE, Presiding Judge.

City-Wide Asphalt Company filed suit against the City of Independence, its city manager, and the members of the city council, (1) to obtain a declaratory judgment that City-Wide had a contract with the City to supply all of its hot asphaltic concrete requirements for the year May 1, 1969, to

April 30, 1970; (2) for judgment for $40,-766.63 for balance due for asphalt, paver and roller use, and (3) for $154,099.98 for loss of profits on the sale of asphaltic concrete because of the purchase by the City from another supplier. The City filed a counterclaim alleging it had paid City-Wide $333,057.40 for asphaltic concrete improperly because the City's agreement to purchase such asphalt was made in violation of its own ordinances and of § 432.070, RSMo 1969, and because the City only obligated itself to purchase 5,000 tons of asphaltic concrete and the City, in fact, paid City-Wide about $300,000 in excess of the cost of 5,000 tons.

Trial was to the court without a jury and the court entered judgment in favor of the City on City-Wide's petition and in favor of the City on the City's counterclaim, and entered judgment against City-Wide for $55,868.25. City-Wide has appealed.

City-Wide asserts the court erred in the following respects: (1) The City was not entitled to recover on its counterclaim; (2) City-Wide was prejudiced by the delay between the date of the trial and the date of the decision; (3) City-Wide had a contract to supply all of the City's asphaltic concrete for one year; (4) City-Wide is entitled to payment for the balance due on asphalt supplied for patchwork; and (5) City-Wide is entitled to recover for paver with operators and for the use of rollers as extras to the contract it did have. Judgment for the City on City-Wide's petition affirmed. Judgment for the City on its counterclaim reversed.

At the threshold is a motion by the City to dismiss the appeal or to affirm the judgment because the brief filed by City-Wide fails to comply with rule 84.04, and because City-Wide failed to preserve the matters it attempts to raise on this appeal by presenting the same to the court in a motion for a new trial.

The brief of City-Wide is not in compliance with Rule 84.04. It is unduly lengthy because counsel has failed to frame the very few questions involved into concise points. Instead, most of the points are disjointed and stated in such fashion as to obscure the precise complaint as to the court's ruling. This brief illustrates one of the biggest problems appellate courts face, i.e., to determine the exact point raised. Counsel will be well advised to take the time necessary to analyze each case to distill the few problems generally involved so that these may be concisely stated. Rule 84.04(d) requires this, and when it is properly done it greatly expedites the disposition of the appeal.

The statement of facts in this brief also fails to comply with the rules. Rule 84.-04(c) requires a fair and concise statement of facts. As is the case with the points relied on, compliance with this rule facilitates the handling of an appeal.

■ Despite the failure of this brief to comply with the rules, its deficiency is not so great as to warrant the drastic remedy of dismissal. However, counsel should expect the courts to exact compliance with the rules with increasing vigor as the case loads mount.

City-Wide has attempted to raise many errors which will not be noticed because of the failure to properly raise them, and because the points heretofore set out fairly raise the viable points which dispose of the controversy between these parties.

■ The City contends City-Wide was required to file a motion for a new trial in this court tried case in order to preserve any of its points for review. Although there may be statements in some of the cases to the contrary, the Supreme Court has held there is no requirement to file a motion for a new trial in a court tried case. *March v. Gerstenschlager*, 436 S.W.2d 6 (Mo.1969). See also Hyde, Appellate Review of Cases Tried By the Court Without a Jury, Journal of the Missouri Bar, Vol. 26, No. 2 (Feb. 1970), and Rule 73.01 effective January 1, 1975.

The trial court entered extensive findings of fact and conclusions of law which have proved to be quite helpful. The facts as found by the trial court, and which find substantial support in the evidence, are as

follows: The City is a constitutional charter city and City-Wide is a Missouri corporation. In early 1969, the City advertised for bids and then circulated to various companies a "request for quotation" for the City's requirement of hot mix asphaltic concrete for a period of one year with a total requirement estimated at 5,000 tons. The asphalt was to be f.o.b. the plant of the supplier.

The asphalt to be obtained under this request was stated to be for street patching, repair materials, and for the use of the park department and for miscellaneous city use.

Pursuant to this request, City-Wide submitted a bid of $6.25 a ton. At a regular meeting of the City Council, a journal entry was made in which it was stated "Council approval is requested to purchase our requirement of hot mix asphalt for the period of one year from the City-Wide Asphalt Company at a cost of $6.25 per ton." The entry showed this motion passed with Councilman Roberts not voting.

The City purchasing agent notified City-Wide of the acceptance of this bid and thereafter between May 1, 1969, and August 1, 1969, the City purchased 5,047.70 tons of asphalt from City-Wide pursuant to such council action. The court found none of the asphalt supplied under this arrangement was intended by either the City or City-Wide to include asphalt to be supplied to the City for a comprehensive overlay program on the city streets.

Subsequent to the City's notification to City-Wide that its bid for the estimated 5,000 tons of asphalt had been accepted, the City advertised for bids for "the furnishing, placing and finishing of 16,250 tons of asphaltic concrete surface mix for the purpose of resurfacing certain streets in District 3 of the City." District 3 referred to councilmanic district 3 of the City. Similar invitations for bids were made for each of the other councilmanic districts of the City. City-Wide submitted a bid to supply the asphalt for District 3 only. Other bids were received for all of the districts.

After the City had opened the bids for all of the districts, and prior to the Memorial Day weekend in 1969, the City public works director conceived a plan for the City to use its own work force to overlay its streets. The public works director made an agreement with City-Wide for City-Wide to supply asphaltic concrete to the job site for a pilot project on two miles of the City's streets. This plan was designed to determine if the overlay program could be conducted at less cost to the City by using city labor with the asphalt delivered to the site by an outside supplier. Subsequent to this pilot project, the city council passed a motion to "authorize the city manager to move immediately to rent a Barber-Green paver and operator to contract with the low bidder on asphaltic material at $6.25 per ton and to rent the ten ton roller and whatever is deemed necessary to fix the streets at once."

The city council again met two weeks later and voted to purchase hot mix asphalt from City-Wide on a delivered basis of $6.65 per ton. No bidding procedures were conducted prior to the passage of this motion. Thereafter, City-Wide supplied asphalt to the City under both the arrangement for asphalt to be delivered f.o.b. City-Wide's plant at $6.25 a ton and for asphalt f.o.b. the job site for the overlay program at $6.65 a ton. City-Wide also furnished a paver with operator at $125 per day and rollers at a cost of $35 per day each for the overlay program.

No contract was entered into between the City and City-Wide for the overlay program. The public works department would request City-Wide to supply a certain amount of asphalt at a certain point and would thereafter send City-Wide a purchase order. City-Wide then sent an invoice to the City for the amount of asphalt supplied together with the cost of the paver and rollers.

The above arrangement existed until August 1, 1969, when a City employee discovered the City was paying for asphalt without a contract and without bids having been taken. Up to that time City-Wide had fur-

nished 49,325.03 tons of asphalt. After terminating the purchase of asphalt from City-Wide, the City contracted with another asphalt supplier for its asphalt requirements on the overlay program.

The plant operated by City-Wide in which it manufactured asphaltic concrete is located on land owned by Paul Roberts, who was a member of the city council between May 1, and August 1, 1969. Russell Buehler, the principal owner of City-Wide, stated his company did not pay Mr. Roberts any rent, but purchased rock from Mr. Roberts. He stated this was the inducement which led Roberts to allow City-Wide to occupy his land rent free. Mr. Buehler further testified he purchased rock from other companies for the requirements needed to supply the City. He did not purchase any rock from Mr. Roberts to fill any City order.

In its conclusions of law the court found: "That it would not be equitable to allow the City to recover the entire cost of the money paid for asphalt and pavers as clear and convincing proof of a fraud was not proved; however, due to the relationships between plaintiff's agents and employees and certain of defendant's agents and employees there was sufficient evidence to prove an indicia of collusion that would make it improper for plaintiff to retain any profit gain under the illegal arrangements referenced above."

City-Wide first questions the judgment against it for the profit on the 43,308.72 tons sold to the City for the overlay program. City-Wide points out the court did not find any fraud had been practiced upon the City, but found only "an indicia of collusion."

The review in this case is under the standard set out in *Murphy v. Carron*, 536 S.W.2d 30, 32[1–2] (Mo.banc 1976).

The earliest case in Missouri which considered the right of a public body to recover money paid for material furnished and work performed was *Sparks v. Jasper County*, 213 Mo. 218, 112 S.W. 265 (banc 1908). In that case Sparks sought to recover balances due for the construction of three bridges. The County filed a counterclaim seeking to recover money previously paid for bridges constructed by Sparks in previous years. The court pointed out the County did not contend the bridges were not constructed according to the terms of the contract, or they were not worth the money paid, or that the County refused to receive the bridges. The court stated the contracts had been fully performed on both sides and the bridges were well built and reasonably worth the money paid for them. Further, the bridges were accepted by the County and had constantly been used by the public with no offer to return them. The court then stated at 112 S.W. 269, "[u]nder those circumstances, conceding for argument's sake the contracts were illegal in their inception, yet it would be unjust and inequitable to permit the county to retain the bridges and at the same time recover back the money paid therefor. That principle of equity should apply here which requires persons who seek equity to do equity before their prayer will be heard. . . . The law is that where there has been a complete performance of the contract on both sides, and it is fair and reasonable in fact, there can be no recovery of the consideration by the municipal corporation where it retains and enjoys the benefits of the contract, and where it cannot or will not restore the property acquired by the contract, even though the contract be one which the law denounces as illegal and which could not be enforced on that account." The court in *Sparks* made an exhaustive review of the law on that subject to buttress its conclusion there could be no recovery by the County. *Sparks* has been followed in *Polk Tp., Sullivan County v. Spencer*, 364 Mo. 97, 259 S.W.2d 804 (1953) and *Bride v. City of Slater*, 263 S.W.2d 22 (Mo.1953). In both *Bride* and *Polk* the court found the contract between the public body and the supplier was invalid because the requirements of law had not been met.

The cases in which a public body has been allowed to recover money paid to a contractor involved contracts which were beyond the power of the corporation to make. See

*County of St. Francois v. Brookshire*, 302 S.W.2d 1 (Mo.1957) and 140 A.L.R. 583. Further, the courts have indicated evidence of bad faith, fraud or collusion would also form a basis for recovery.

In this case the City contends the purchase of asphalt for the overlay program was illegal because not made in conformity with § 432.070 which requires a contract to be within the scope of the powers of the public body and in writing and upon a consideration wholly to be performed subsequent to the making of the contract and to be subscribed by the parties or their agents authorized by law and in writing. There is no doubt the purchase of asphalt for the overlay program was in violation of this section. However, the purchase of asphalt was within the power of the City.

The City did not plead or prove any fraud in connection with this contract. The only evidence of fraud or collusion on which the City relies is the occupation of some of Councilman Roberts' land by City-Wide, the fact Buehler was at one time employed by the City, and the friendship existing between Buehler, Councilman Roberts and Allen Young, the City's public works director. There was no evidence of any improper action. There was nothing to indicate Mr. Roberts asserted any influence on the City to purchase asphalt from City-Wide. The only evidence concerning any action by Roberts in connection with such purchase was the notation in the minutes of the city council meeting when City-Wide's first bid was accepted which noted Mr. Roberts abstained from voting on such motion.

Nor was there any evidence of any defect in the asphaltic concrete supplied by City-Wide or that the price charged was unreasonable. In fact, the evidence would indicate the City obtained asphalt from City-Wide at a lower cost than it paid the supplier who succeeded City-Wide in selling asphaltic concrete to the City.

■ Likewise the City makes no contention the purchase of asphaltic concrete was without its powers. In the final analysis the only basis upon which the City makes its claim to recover any money from City-Wide is the friendship which existed between Buehler, Roberts and Young, and the opportunity for wrongdoing. Absent any proof of fraud, and absent any evidence the price charged by City-Wide was unreasonable or that the material sold by it to the City was of inferior quality, there is no basis upon which the City is entitled to recover any amount paid to City-Wide for asphalt previously supplied.

Furthermore, the City obviously could not tender the asphalt delivered and placed on the streets. This was a further requirement to the City obtaining recovery as held in *Sparks*.

It is significant the court did not find evidence of fraud, collusion or unfair dealing. The finding of the indicia of collusion only indicates an indication of collusion. The indication or possibility of collusion is not sufficient. The evidence must support a finding of actual collusion or fraud.

■ The court also penalized City-Wide only for its profit. No authority has been cited or found which supports such action. Under the cases it would seem the City was entitled to all or none of the money paid City-Wide. It follows the judgment for the City on its counterclaim is not supported by substantial evidence and must be set aside.

■ City-Wide next complains of the delay of the trial judge in making a decision in this case. The judgment, findings of fact and conclusions of law were entered about sixteen months after the evidence was heard. The trial judge acknowledged this was an undesirable length of time. City-Wide contends it was prejudiced by this delay but does not demonstrate in what way except by passage of time. It states it is entitled to a new trial on this ground alone.

■ Generally, there would be no occasion to remand a court tried case for a new trial. Under Rule 84.04 the appellate court simply enters such judgment as the trial court should have entered. Further, City-Wide has not demonstrated any prejudice as a result of the delay.

While delay is one of the big targets of court criticism, in the circumstances of this case no prejudice is shown and no ground for relief is asserted. 46 Am.Jur.2d, Judgments, § 60, p. 355.

City-Wide further contends the language contained in the request for quotation and the city council motion was broad enough to give rise to a contract by which City-Wide acquired the right to supply all of the asphaltic concrete which the City would use for the year May 1, 1969, to April 30, 1970. Under this theory, City-Wide claimed the profit it would have made had it sold all of the asphalt the City actually purchased during the balance of the year after the City ceased purchasing from City-Wide. The court found, based upon substantial evidence, that the request for quotation to which City-Wide originally responded was issued for the procurement of street patching, repair materials and for use by the park department in miscellaneous city requirements. There was nothing to indicate at that time the City was requesting bids for the requirements of the street overlay program. This is bolstered by the fact the City actually advertised for and received bids for the overlay program. In fact, City-Wide submitted a bid for the overlay program for one of the four districts established in the City.

Although all bids on the overlay program were rejected, the evidence is clear the City and City-Wide considered the overlay program to be completely separate and apart from the so called patch program under which City-Wide was furnishing asphalt f.o.b. at its plant. There was nothing in the conduct of either the City or City-Wide to indicate either party considered the overlay program to be included in the original bid that City-Wide submitted at $6.25 per ton. In fact, the price City-Wide charged for the overlay program was $6.65 a ton delivered at the job site and City-Wide was contending it was entitled in fact to $6.75 per ton because of a mistake the city manager made in transmitting City-Wide's proposal to the city council. Thus, the parties themselves did not construe any agreement existing between them prior to the beginning of the overlay program to include the asphalt supply for that project.

■ "The construction that the parties place upon a contract or an agreement as evidenced by the acts and conduct is strong evidence of the real intention of the parties." *Wilkinson v. Tarwater,* 393 S.W.2d 538, 543[7] (Mo.1965). In this case the acts of the parties show beyond doubt they did not consider the City to be bound to purchase all of its asphalt from City-Wide. This, together with the other evidence in the case, shows there was no agreement between the parties for City-Wide to supply all of the City's asphalt.

■ City-Wide contends the court erred in failing to find City-Wide was entitled to payment for certain purchase orders for asphalt which City-Wide states showed the asphalt was for the patch program. In all of the purchase orders involved, except one, the invoice submitted by City-Wide revealed a drayage charge was included which indicated the asphalt had been delivered to the job site. This was in contrast to the asphalt supplied under the patch program which was delivered to the City at City-Wide's plant and for which City-Wide did not charge any drayage fee. The Court was fully justified under the evidence in finding these purchase orders were for asphalt delivered to the overlay program. Because there was a complete failure to observe the requirements of § 432.070 for the purchase of asphalt for the overlay program, the court properly refused to require the City to pay for these invoices and purchase orders. The only purchase order which did not show a drayage charge was paid except for $131.75. However, City-Wide failed to show which program this invoice fell under. The court was correct in refusing to award City-Wide a judgment for the purchase orders in question.

City-Wide also contends the court erred in refusing to enter judgment for the cost of furnishing a paver with operator and for the use of rollers. The paver and rollers were used on the overlay program. As noted, there was no contract whatever for

the overlay program and likewise there was no contract between the City and City-Wide for the supply of pavers, operators and rollers. For that reason, City-Wide was not entitled to a judgment for these items. § 432.070; *Needles v. Kansas City,* 371 S.W.2d 300 (Mo.1963).

The judgment for the City on City-Wide's petition is affirmed. The judgment for the City on its counterclaim is reversed. Accordingly, the costs on this appeal should be equally divided between the parties. Rule 77.16, *Missouri Cafeteria v. McVey,* 362 Mo. 583, 242 S.W.2d 549 (1951).

All concur.